FILED
CLERK

12/13/2012 10:39 am

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
MARCIA-LUCIA ANGHEL, M.D.,

                Plaintiff,

            -against-

KATHLEEN SEBELIUS,
in her capacity as Secretary of Health and
Human Services,

            Defendant.
--------------------------------------------------------X

**MEMORANDUM OF**
**DECISION AND ORDER**
10-CV-4574 (ADS)(AKT)

**APPEARANCES:**

**THE BURNEY LAW FIRM, LLC**
*Attorneys for the Plaintiff*
622 E. 20th Street, 10H
New York, NY 10009
      By:    Nathaniel E. Burney, Esq., Of Counsel

**LORETTA E. LYNCH, UNITED STATES ATTORNEY**
**EASTERN DISTRICT OF NEW YORK**
*Attorneys for the Defendant*
610 Federal Plaza
Central Islip, New York 11722
      By:    Robert W. Schumacher, II, Assistant United States Attorney

**SPATT, District Judge.**

      The Plaintiff Maria-Lucia Anghel M.D. ("the Plaintiff" or "Dr. Anghel"), is a board-certified physician in anesthesiology and pain management and a Medicare supplier. The Plaintiff commenced this action for review of a final decision by the Medicare Appeals Council ("MAC"), which upheld the ruling of United States Administrative Law Judge ("ALJ") Jimmy R. Barkalow. (ALJ Appeal No. 1-422212900; MAC Docket No. M-10-110.) The Plaintiff's complaint alleges that she was incorrectly found to have received overpayment from Medicare for the calendar year of 2004 because: (1) the Medicare Contractor's overpayment calculations

1

were improper and not supported by substantial evidence; (2) the ALJ abused his discretion and violated her due process rights by making an evidentiary ruling excluding Dr. Anghel's evidence without notice; and (3) Dr. Anghel exercised reasonable care and was without fault.

Presently before the Court are cross-motions for judgment on the pleadings, pursuant to Federal Rule of Civil Procedure 12(c) ("Fed. R. Civ. P. 12(c)" or "Rule 12(c)"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) to review the Secretary's final decision. For the reasons set forth below, the Plaintiff's motion for judgment on the pleadings is denied and the Defendant's cross-motion for judgment on the pleadings is granted.

## I. BACKGROUND

The following facts are derived from the extensive administrative record preceding this appeal, the pleadings, and the parties' submissions on the motions.

### A. <u>Factual Background</u>

Dr. Anghel is a board-certified physician in anesthesiology and pain management, and operates the Interventional Pain Management Center in East Meadow, New York. (Plaintiff's Memorandum of Law ("Pl's Memorandum") at 3, ¶¶ 1–3.) Since 1989, Dr. Anghel built her practice serving mostly elderly Medicare patients with chronic conditions. In 2004, Dr. Anghel added physical therapy services to her practice, which were performed by other specialists. Dr. Anghel has been a resident of Oceanside, New York, and at all relevant times conducted business in East Meadow, New York. (Complaint at 1, ¶ 4.)

Beginning in late 2004, private Medicare carriers determined that Dr. Anghel received overpayment from Medicare for the 2004 calendar year. That finding was properly challenged administratively, and ended with a decision issued by the MAC, which represents a final decision by the Secretary of the United States Department of Health and Human Services, Katheleen

Sebelius ("the Defendant" or "the Secretary").  This is the determination for which the Plaintiff

now seeks judicial review.

**B.  <u>The Statutory and Regulatory Framework</u>**

Before the Court proceeds to review the particular circumstances involved in this appeal,

it is necessary to explore the relevant statutory and regulatory framework.

**1. Medicare Statutory Background**

Medicare, the federal medical insurance program for the aged and disabled, is governed

by Title XVIII of the Social Security Act (the "Act"), codified at 42 U.S.C. §§ 1395–1395gg.

The Centers for Medicare & Medicaid Services ("CMS") of the United States Department of

Health and Human Services ("HHS") is responsible for administering the Medicare Program.

Medicare consists of four basic parts, Parts A through D.  Part A of the Medicare Program ("Part

A") authorizes payment for primary institutional care, including hospitals, skilled nursing

facilities, and home health care.  <u>See</u> 42 U.S.C. § 1395c, *et. seq*.  Part B of the Medicare Program

("Part B") authorizes payment for various medical and other health services and supplies,

including outpatient services.  <u>See</u> 42 U.S.C. § 1395j, *et. seq*.  This case involves Part B of the

Medicare Program because the services at issue are outpatient services provided to non-

hospitalized beneficiaries.

The Secretary of HHS, presently Sebelius, contracts with private insurance companies

("Carriers") to perform various functions necessary for the efficient administration of Part B of

the Medicare Program.  <u>See</u> 42 U.S.C. § 1395u.  These functions include determining whether

claimed services are medically necessary, calculating the amounts of any Part B payments due,

and paying claims out of the Medicare Trust Funds.  <u>See</u> 42 U.S.C. § 1395u(a)(1); 42 C.F.R. Part

405, Subpart E; 42 C.F.R. Part 414; 42 C.F.R. §§ 421.5, 421.200.

3

### 2. Overpayment Determinations and the Medicare Appeals Process

The Medicare statute provides that the Secretary may not provide reimbursement for "items or services . . . not reasonable and necessary for the diagnosis or treatment of illness or injury." State of N.Y. on Behalf of Bodnar v. Sec'y of Health & Human Servs., 903 F.2d 122, 124 (2d Cir. 1990); 42 U.S.C. § 1395y(a)(1)(A) (Supp. V 1987).  The Secretary may take into account "not only what kind of services were provided, but also where those services were provided" in determining whether services rendered are "not reasonable and necessary." Id. at 125.

However, due to the large number of Medicare claims submitted annually to Carriers, "it is virtually impossible to examine each bill . . . in sufficient detail to assure before payment in every case that only medically necessary services have been provided."  HCFA Ruling 86-1.

Therefore, Section 1842(a) of the Social Security Act, 42 U.S.C. § 1395u(a), authorizes Carriers to conduct post-payment audits of providers' records to ensure that proper payments have been made.  Medicare carriers are considered "indispensable components of the governmental program and are in a unique position to combat the drain on public resources caused by fraudulent claims." Pani v. Empire Blue Cross Blue Shield, 152 F.3d 67, 73 (2d Cir. 1998) (citing United States v. Erika, Inc., 456 U.S. 201, 203, 208 n.11, 102 S. Ct. 1650, 72 L. Ed. 2d 12 (1982) (discussing efficiency of private insurance companies paying Medicare claims given the volume of such claims)). See Group Health Inc. v. Blue Cross Assn., 739 F. Supp. 921, 933 (S.D.N.Y. 1990) ("HHS and the Secretary rely heavily on the participation of fiscal intermediaries, who possess accounting and health care expertise, in order to efficiently administer the [Medicare] program.").  The Secretary has developed guidance to Carriers in

4

conducting statistical sampling for use in estimating overpayments, contained in the Medicare Program Integrity Manual ("MPIM").

In conducting a post-payment audit, the Carriers may first request a probe sample of billings from a physician, in order to determine whether there is a likelihood of overpayment by Medicare. In the present action, the initial probe sample was conducted by National Government Services ("NGS").

Following a probe sample, a Carrier may then request a statistically valid random sample ("SVRS") from the physician. The SVRS is then extrapolated to the physician's total billing, in order to provide a reasonable approximation of the total overpayment when the quantity of billing is overly abundant. If, following an audit, a Carrier determines that an overpayment has been made, the Carrier may offset or recoup Medicare payments from the provider. See 42 C.F.R. § 405.371(a)(2). An "offset" is "[t]he recovery by Medicare of a non-Medicare debt by reducing present or future Medicare payments and applying the amount withheld to the indebtedness." 42 C.F.R. § 405.37MAI0. A "recoupment" is "[t]he recovery by Medicare of any outstanding Medicare debt by reducing present or future Medicare payments and applying the amount withheld to the indebtedness." 42 C.F.R. § 405.370. In this case, after NGS conducted the probe review and possible overpayment by Medicare was determined, the case was subsequently referred to PSC Medicare Eastern Benefit Integrity Support Center ("Eastern Benefit") which conducted the further investigation and the SVRS.

After a determination of overpayment by a Carrier, a physician, such as Dr. Anghel, is entitled to an administrative appeal process. 42 U.S.C.A. § 1395ff. First, if dissatisfied with the initial overpayment determination, a physician may request a redetermination by the Carrier. Second, if the physician is again dissatisfied following the Carrier's redetermination, they may

then request an additional reconsideration by a qualified independent contractor ("QIC").  In this

case the QIC was First Coast Services ("First Coast Services").  (ALJ Appeal No. 1-422212900;

Transcript ("Tr.") at 298, ¶ 3.)

Third, if dissatisfied with the decision of the QIC, a physician may request a hearing

before an ALJ.  Fourth, the ALJ's decision is subject to review by the MAC of the Departmental

Appeals Board ("DAB"), which represents the final decision by the Secretary of HHS.  Finally,

after pursuing all the aforementioned administrative hurdles, as in the present case, the MAC's

decision is subject to judicial review, pursuant to 42 U.S.C. § 405(g).

### 3. Medicare Coverage at Issue

Next, the Court will specifically explore the disputed coverage that forms the core of the

present appeal.  The services largely at issue are physical therapy services, which are governed

by 42 U.S.C. §1395x(p), 42 C.F.R. 410.59-.60, Chapter 15 of the Medicare Benefit Policy

Manual ("MBPM") entitled "Covered Medical and Other Health Services".  Therapy services are

a covered benefit in §§1861(g), 1861(p), and 1861(ll) of the Act.  However, in order for a service

to be covered, it must have a benefit category in the statute, it must not be excluded, and it must

be reasonable and necessary.  Of importance, the services must relate directly and specifically to

a written treatment plan that is established, either orally or written, before treatment is begun.

Under the federal regulations, the plan must contain, at minimum, the following information:

diagnoses; long term treatment goals; and the type, amount, duration and frequency of therapy

services.  See 42 C.F.R. §§ 424.24 and 410.61.

**C. <u>Administrative and Procedural History</u>**

In accordance with the administrative procedure defined above, and required for a proper appeal of a determination of overpayment by a Carrier, the Court will now address the administrative and procedural background with respect to Dr. Anghel's present suit.

**1. Probe Sample:  Initial Overpayment Determination**

In late 2004, Dr. Anghel was contacted by a Medicare Contractor, National Government Services ("NGS"), who determined that there might be an "aberrant pattern" in the Plaintiff's billing practice.  (Def's Memorandum of Law in Support of Cross-Motion ("Def's Memorandum") at 6, ¶ 1; Pl's Memorandum at 4, ¶ 2.)  The Contractor requested records pertaining to a sample of 40 claims for services that had been provided to six patients during February and March 2004.  The Plaintiff asserts that she telephoned NGS to inform them that they had "applied the wrong standard" and erroneously compared her practice's billings with the expected billings of an internal medicine practice instead of an interventional medicine practice, and thus the "aberrant pattern" had a legitimate explanation.  (Pl's Memorandum at 4, ¶ 2.) Nevertheless, NGS conducted a probe review, or sample of potential problem claims ("Probe Sample"), to validate the hypothesized potential overpayment. (Def. Memorandum at 6, ¶ 1.) The Probe Sample reviewed approximately 285 records relating to physical therapy for the time period between February 1, 2004 and March 31, 2004, and denied 151 services as "not medically necessary."  (Tr. 664–65; Pl's Memorandum at 4, ¶ 2; 5, ¶ 5.)  The Probe Sample found the overpayment to be $5,805.96.  (Def's Memorandum at 6, ¶ 2.)

In the present appeal, the Plaintiff raises several issues with regard to this initial probe sample.  First, she alleges that there is no evidence that the Contractor documented its reasons for selecting Dr. Anghel's services for a probe review.  Second, she claims that the services

contained in the probe sample were coded correctly, and thus should have been found to be covered by Medicare. Third, she argues that the 151 denied services were incorrectly assessed, because the Contractor compared the claims in the probe sample with those of providers in a different specialty—namely, an internal medicine practice instead of an interventional medicine practice.

### 2. Statistically Valid Random Sample and Extrapolation

Following the Probe Sample, NGS referred the case to another Medicare Contractor, PSC Medicare Eastern Benefit Integrity Support Center ("Eastern Benefit"), who requested a larger sample of services from Dr. Anghel's practice in 2004 to perform a "statistically valid random sample" ("SVRS"). (Tr. at 1389–93; Pl's Memorandum at 5, ¶ 7.) The SVRS consisted of 466 services lines and 853 total services for 37 patients during the calendar year of 2004. (Def's Memorandum at 27, ¶ 1, Table; Pl's Memorandum at 6, ¶ 1.) As stated above, the SVRS is utilized when a claim-by-claim review of all the services is not possible. (Tr. at 624.)

After extrapolating from this SVRS, Eastern Benefit determined the overpayment for the year 2004 to be $298,069.94, and ultimately demanded the reduced figure of $288,504.69. (Tr. at 655; Pl's Memorandum at 7, ¶ 5.) In addition to reviewing the designated services in the SVRS, Eastern Benefit reviewed Dr. Anghel's other ancillary services on the claims ("Ancillary Services") which included codes: 97001, 97035, 99213, 99243, G001, J1040, and J2400. (Tr. at 654.) Eastern Benefit determined the overpayment for these Ancillary Services to be $670.36. Id. On December 21, 2007, Dr. Anghel was notified of this determination, and a formal demand for repayment was issued by NGS on January 8, 2008. (Def's Memorandum at 11, ¶ 4; Pl's Memorandum at 8, ¶¶ 1–2.)

8

Because one of Dr. Anghel's primary contentions relies on the validity of the SVRS analysis and extrapolation in determining overpayment, the Court finds it significant to provide a brief overview of the analysis applied in the SVRS.  (See Tr. at 652.)  In conducting the SVRS, Eastern Benefit applied the methodology contained in CMS's guidelines to perform the statistical sampling.  (Def's Memorandum at 6, ¶ 3.)  Key steps include defining the universe under review; selecting the sample; determining the designated overpayment in the sample; and estimating the overpayment in the universe.  (Tr. at 652.)

A universe is a set of claims that meet certain criteria.  Eastern Benefit obtained the SVRS universe from a Provider Utilization Report obtained through the affiliated Contractor, Empire Medicare Services, to define the particular parameters for services in 2004.  (Tr. at 624.)  After defining the universe, the next step involved creating a sampling frame, or listing, of the claim numbers in the universe.  By applying the relevant parameters, Eastern Benefit determined that there were 1,042 claims that comprised the sampling frame for the SVRS, which included 12,494 allowed services.  (Tr. at 653.)  Once the sample frame was determined, a group of claims was randomly selected from the universe.  In other words, it was from the universe of 1,402 claims from which the SVRS sample was chosen.  In this case, 95 claims from the sample frame were utilized as the SVRS sample, which included 853 services.  The size of the sample was calculated based upon the number of claims in the universe and a 90% confidence level.

Once this randomized sample was generated, Eastern Benefit reviewed the medical records and supporting documentation of the 95 claims, and determined the appropriateness and overpayment of claims to be $20,192.16.  (Tr. at 653.)  Based on the sample findings, Eastern Benefit estimated the total overpayment in the universe through extrapolation.  Ultimately, the

review calculated a total overpayment of $298,069.94 in the universe of 1,042 claims, which stemmed from the sample of 95 randomly selected claims.  (Tr. at 655.)

In the present appeal, the Plaintiff raises several issues with this statistical analysis.  First, she once again argues that the specialty code for internal medicine was being used, instead of the correct codes for physical therapy and pain management, and therefore the billings of Dr. Anghel's specialized services were being compared to the wrong standard.  In particular, she argues that the services for the first half of 2004 were compared with internal medicine (specialty code 11), instead of physical therapy (specialty code 65) or interventional pain management (specialty code 9), and that the services for the second half of 2004 were compared with a different pain management specialty (specialty code 72).  Second, the Plaintiff argues that the Contractor did not extrapolate from the original probe sample, but rather simply added the SVRS and the probe sample together.  Third, she contends that the sample was not in fact random, in that the vast majority of services in the sample were physical therapy services.  Finally, Dr. Anghel asserts that some services were denied as being undocumented, but that no documentation had been requested for those particular services.

### 3. Redetermination and Reconsideration by a Qualified Independent Contractor

On May 1, 2008, Dr. Anghel requested a redetermination by NGS.  (Def's Memorandum at 11, ¶ 4; Pl's Memorandum at 8, ¶ 1–2.)  NGS completed a new and independent redetermination of each service listed in Eastern Benefit's audit.  On June 19, 2008, NGS issued to Dr. Anghel a partially favorable redetermination and reduced the extrapolated overpayment to $242,913.314.  (Tr. at 627.)  On August 21, 2008, Dr. Anghel next requested reconsideration by a qualified independent contractor ("QIC").  (Tr. at 570.)  On November 6, 2008, the QIC issued

10

a partially favorable redetermination decision which reduced the number of overpaid services from those first calculated by Eastern Benefit in the SVRS. (Tr. at 603–08.)

Further, the QIC denied Dr. Anghel's request to overturn the SVRS completely, stating that "the appellant [Dr. Anghel] in this case does not present evidence as to how or why his/her patient population is uniquely different than those for whom the sampling methods were developed, the decision to overturn the use of sampling and the subsequent extrapolation of the overpayment is unfavorable." (Tr. at 576.) The QIC also took issue with Dr. Anghel's documentation. This is precisely why the QIC found twenty-five claims favorable, but denied the remaining claims. (Tr. at 380.) The QIC indicated that "the documentation did not include clearly written care plans with measureable short term or long term goals for the physical therapy treatment." (Id.) In light of the undocumented goals, the QIC also noted that there was "no indication of improvement or advancement towards the goals that would justify the performance of the services in accordance with Medicare guidelines." (Id.) As a result, the QIC found that the services rendered unfavorable by Eastern Benefit during redetermination, due to no documentation, would "continue to be denied as no documentation was submitted." (See Tr. at 578 (listing services provided by Dr. Anghel that the QIC deemed favorable and unfavorable).)

### 4. Administrative Hearing

After reconsideration by the QIC, Dr. Anghel sought a hearing before an administrative law judge (the "ALJ"). (Tr. at 1358.) On July 21, 2009, a hearing was held via video teleconference before ALJ Jimmy R. Barkalow. (Id; Pl's Memorandum at 8, ¶ 4.) On July 17, 2009, prior to the hearing, a report was prepared by Dr. Anghel's expert witness, Jacqueline Thelian ("Thelian"), a Medicare billing consultant. Thelian agreed with Medicare only "on 57

11

dates of services (48%) and disagreed with Medicare on 61 dates of service (52%)."  (Tr. at 504; Def's Memorandum at 12, ¶ 3; Pl's Memorandum at 8, ¶ 4.)

Thereafter, on the morning of the hearing, a revised report was prepared by Thelian, which found further error in the extrapolation.  In particular, this revised report detailed how approximately 96.2% of the services were in fact not overpayments.  Id.  At the hearing before the ALJ, the revised report was admitted into evidence.  However, after the close of the hearing, the ALJ refused to admit the revised report and struck it from the record.  The ALJ reasoned that the revised report was inadmissible because Dr. Anghel's counsel "attempted to inject new evidence and expert testimony based on new evidence without an explanation as to why the records were not submitted previously."  (Tr. at 418, at ¶ 2.)  Moreover, the ALJ emphasized that because the QIC provided a detailed explanation of services lacking documentation in its reconsideration, Dr. Anghel could not thereafter claim that she was unaware of any possible missing documentation.  Id.

On August 20, 2009, the ALJ issued a partially favorable decision for Dr. Anghel, affirming the QIC's finding and directing that several duplicate claims be stricken from the extrapolation.  (Tr. at 294.)  The ALJ further rejected Dr. Anghel's argument that NGS did not properly select her for a Probe Sample and extrapolation overpayment, in accordance with 42 U.S.C. § 1395ff(f)(3).  In so finding, the ALJ reasoned that NGS's Probe Sample and determination of sustained and high levels of payment error were not subject to administrative or judicial review.  (Tr. at 415, at ¶ 2.)

### 5. Medicare Appeals Council Review of ALJ Decision

On October 23, 2009, Dr. Anghel filed a request for review of the ALJ's decision with the MAC.  (Tr. at 1–11.)  On August 3, 2010, the MAC rejected all of Dr. Anghel's arguments

12

and adopted the ALJ's opinion.  Id.  According to the Plaintiff, the MAC decision erroneously (1) upheld the ALJ's refusal to review the initial determination of a sustained and high level of payment error; (2) upheld the ALJ's retroactive exclusion of Dr. Anghel's evidence after the close of the hearing; and (3) upheld the ALJ's finding that Dr. Anghel's documentation was not standard, and so even though the necessary substance was there, Dr. Anghel had received overpayment.

### 6. Appeal to this Court

On October 6, 2010, Dr. Anghel filed this present action pursuant to 42 U.S.C. § 1395ff(b).  On March 14, 2011, Defendant Sebelius served the administrative record and filed her answer.  Subsequently, both parties filed motions for judgment on the pleadings.

## II.  DISCUSSION

### A. Standard of Review

A federal court's review of the Secretary's final decision in a Medicare reimbursement dispute is governed by a separate standard from those enumerated above for each level of the administrative appeal.  Under the Medicare statute, "judicial review of the Secretary's action is to be conducted in accordance with the standards set forth in the Administrative Procedure Act ('APA')."  Visiting Nurse Ass'n of Brooklyn v. Thompson, 378 F. Supp. 2d 75, 86 (E.D.N.Y. 2004) (citing Huntington Hosp. v. Shalala, 130 F. Supp. 2d 376, 382 (E.D.N.Y. 2001)).

The Medicare Act provides that "the findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive."  See 42 U.S.C. § 405(g), incorporated into 42 U.S.C. § 1395ff(b).  Substantial evidence is that which a "reasonable mind might accept as adequate to support a conclusion . . ."  Quinones v. Chater, 117 F.3d 29, 33 (2d Cir. 1997) (quoting Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)).  It

requires "'something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.'" Corrosion Proof Fittings v. EPA, 947 F.2d 1201, 1213 (5th Cir. 1991) (quoting Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620, 86 S. Ct. 1018, 16 L. Ed. 2d 131 (1966). If substantial evidence supports the Secretary's decision, "the decision must be upheld, even if there is also substantial evidence for the plaintiff's position." Kaplan v. Leavitt, 503 F. Supp. 2d 718, 722 (S.D.N.Y. 2007) (quoting Schauer v. Schweiker, 675 F.2d 55, 57 (2d Cir. 1982)). "The court may not substitute its own judgment for that of the Secretary, even if it might justifiably have reached a different result upon a *de novo* review." Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991) (quoting Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984)).

Although the reviewing district court must defer to the Secretary's findings of fact, it "is not bound by the Secretary's conclusions or interpretations of law, or an application of an incorrect legal standard." Executive Dir. of Office of Vt. Health Access v. Sebelius, 698 F. Supp. 2d 436, 439 (D. Vt. 2010) (citing Gartmann v. Sec'y of U.S. Dep't of Health & Human Servs., 633 F. Supp. 671, 670 (E.D.N.Y. 1986)). "Where an error of law has been made that might have affected the disposition of the case, this court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ." Townley v. Heckler, 748 F.2d 109, 112 (2d Cir. 1984) (quoting Wiggins v. Schweiker, 679 F.2d 1387, 1389 n.3 (11th Cir. 1982)).

## B. As to the Plaintiff's Challenges to the Secretary's Decision

The Court will now consider the Plaintiff's claims contained in her motion for judgment on the pleadings, while disregarding any arguments that were raised for the first time in her reply

memorandum.  "It is well settled in the Second Circuit that a party may not raise an argument for the first time in his reply brief."  Morgan v. McElroy, 981 F. Supp. 873, 876 n.3 (S.D.N.Y. 1997); see also Evangelista v. Ashcroft, 359 F .3d 145, 156 n.4 (2d Cir. 2004) (observing that the Second Circuit "will not consider an argument raised for the first time in a reply brief"); Jacobs v. Citibank, N.A., No. 01 Civ. 8436, 2004 WL 2389897, at *2 (S.D.N.Y. Oct. 25, 2004) ("Arguments made for the first time in a reply memorandum of law or reply brief are, generally, not considered by a court."); Farey-Jones v. Buckingham, 132 F. Supp. 2d 92, 100 (E.D.N.Y. 2001) ("[I]t is procedurally improper to raise an issue . . . for the first time in reply papers, thereby precluding the plaintiff from offering a meaningful response.")

## 1. As to the Administrative Findings that Affirmed the Initial Determination of a Sustained or High Level of Payment Error

The first main area of contention raised by Dr. Anghel concerns the initial determination of a sustained or high level of payment error by the Medicare Contractor.  In particular, the Plaintiff argues that: (1) before engaging in the probe samples and SVRS extrapolations, the Medicare Contractor—here, NGS— did not first investigate to determine whether the initial appearance of error has some legitimate explanation, citing MPIM § 3.2; (2) the Contractor failed to document its reasons for selecting Dr. Anghel for the probe review, citing MPIM §§ 3.2(A) and 3.11.1.1; and (3) that the Contractor failed to compare Dr. Anghel's billings with those of practitioners in the same specialties.

Medicare may use extrapolation for the purpose of calculating overpayments, but only if the Secretary determines there is a sustained or high level of payment error, or documented educational intervention had failed to correct the payment error.  See 42 U.S.C. § 1395ddd(f)(3).

The governing federal regulations classify "[d]eterminations by the Secretary of sustained or high levels of payment errors" as an "[a]ction that [is] not [an] initial determination [ ] and [is]

15

not appealable." 42 C.F.R. § 405.926. However, in comments made during the notice-and-comment rulemaking process, the Secretary stated that "Congress required *contractors* to identify a likelihood of sustained or high level of payment error." 74 Fed. Reg. 65296, 65303 (emphasis added). The MPIM provides Contractors with guidance concerning how the "sustained or high level of payment error" determination should be made. See Pub. 1008–08, Trans. 114 (June 10, 2005), Requirement No. 3734.2. Specifically, it provides that a Contractor may use a "variety of means" to identify the requisite level of payment error, including, for example, sample probes, information from law-enforcement investigations, provider history, and allegations of wrongdoing by current or former employees. See id.

    As set forth above, NGS conducted a probe review, or sample of potential problem claims, to validate its hypothesis that the claims were being billed in error. NGS reviewed 285 records relating to physical therapy services for the time period between February 1, 2004 and March 31, 2004, and denied 151 services as not medically necessary and 2 services as not separately payable from another procedure paid on the same date of service. (Tr. 664–65.) The probe sample overpayment was determined to be $5,805.96.

    The Defendant asserts that this determination by the Secretary is not subject to judicial review, and even if it was, substantial evidence demonstrates that the requisite findings were made. (Def's Memorandum at 6, ¶ 3.)

    Here, the Defendant directs the Court to both the text of the Medicare Act and the CMS's regulations and manual. 42 U.S.C. § 1395ddd(f)(3) of the Medicare Act states that "there shall be no administrative or judicial review under section 1869, section 1878, or otherwise, of determinations by the Secretary of sustained or high levels of payment errors." See also 42 C.F.R. § 405.926(p) ("Actions that are not initial determinations and are not appealable under

16

this subpart include, but are not limited to—Determinations by the Secretary of sustained or high levels of payment errors in accordance with section 1893(f)(3)(A) of the Act"). Moreover, the Defendant notes that although she believes that the statutory language speaks for itself, even if it were ambiguous, the Secretary's construction of the Medicare Act is entitled to substantial deference. See Chevron v. Natural Res. Def. Council, 467 U.S. 837, 844, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984); (Def's Memorandum at 16, ¶ 2.) Therefore, the Defendant asserts that because the Secretary determined that there is no administrative or judicial review of these determinations of high levels of payment, the Court should not address the Plaintiff's contentions in this regard.

In this case, the Court agrees that the determination of a sustained or high level of payment error is not subject to administrative or judicial review. See Gentiva Healthcare Corp. v. Sebelius, 857 F. Supp. 2d 1, 13 (D. D.C. 2012) ("Gentiva maintains that even if a Medicare contractor like Cahaba can make the 'sustained or high level of payment error' determination, no such level of payment error was present here. The Court, however, lacks jurisdiction to consider that argument."); Miniet v. Sebelius, No. 10 Civ. 24127, 2012 WL 2930746, at *5 (S.D. Fla. July 18, 2012); Morgan v. Sebelius, No. 11 Civ. 0300, 2012 WL 1231960, at *1 (S.D. W.Va. Apr. 12, 2012) ("This statutory language clearly and unequivocally prohibits judicial or administrative review of a determination of a high level of payment error."). In fact, it appears that the Plaintiff also agrees that there is no judicial review of the initial findings of a high error rate. (See Pl. Mem. at 19 ("Although the ALJ could not review the particular finding of a high error rate . . .").)

The language of 42 U.S.C. § 1395ddd(f)(3), provides that "[t]here shall be no administrative or judicial review under section 1395ff of this title, section 1395 oo of this title, or

17

otherwise, of determinations by the Secretary of sustained or high levels of payment errors under this paragraph." While there is a "strong presumption that Congress intends judicial review of administrative action," <u>Bowen v. Mich. Acad. of Family Physicians</u>, 476 U.S. 667, 670, 106 S. Ct. 2133, 90 L. Ed. 2d 623 (1986), the presumption is overcome with this language, which indicates "clear and convincing evidence" that Congress intended to preclude review. <u>Abbott Laboratories v. Gardner</u>, 387 U.S. 136, 141, 87 S. Ct. 1507, 18 L. Ed. 2d 681 (1967). "Indeed, it is difficult to think of anything 'Congress could have said to make the plain and unambiguous language of the statute, and its corresponding intent more clear.'" <u>Gentiva</u>, 857 F. Supp. 2d at *14 (quoting <u>Painter v. Shalala</u>, 97 F.3d 1351, 1356 (10th Cir. 1996)).

Moreover, the notion that Congress would want to insulate the "sustained or high level of payment error" determination from judicial review is a logical one. This initial determination does not define the final overpayment calculation. Instead, as both parties have indicated, this determination only serves as an impetus for subsequent determinations, included the SVRS extrapolation. "No sanction attaches to this initial determination; it merely permits a contractor to use a particular method of calculation in determining an overpayment amount." <u>Gentiva</u>, 857 F. Supp. 2d at 14.

As such, the Secretary is entitled to judgment on the pleadings on the issue of whether the extrapolation should have been conducted. The validity of the determination of "sustained or high level of payment error" will not be considered on this appeal.

## 2.   As to the Administrative Findings Regarding the Validity of the Statistical Methodology for Extrapolation

The next main area of dispute in the instant appeal surrounds the validity of the statistical methodology for the SVRS extrapolation by Eastern Benefit that was upheld by the Secretary, which Dr. Anghel asserts was "rife with error." (Pl's Memorandum at 16-17.) Here, Dr. Anghel

asserts the SVRS was tainted because of "internal inconsistency in the contractor's own data." Id. Although the statistical analysis was explained at length above, it is helpful to restate some of the salient points here.

The matter was referred from NGS to Eastern Benefit, which applied the methodology contained in CMS's guidelines to perform the statistical sampling. Briefly, Eastern defined the universe of all fully and partially paid claims submitted by Dr. Anghel. The universe was defined by: (1) dates of service between January 1, 2004 and December 31, 2004; (2) paid amounts greater than 0; and (3) containing procedure codes 97110 (therapeutic exercises), 97112 (neuromuscular reeducation), 97140 (manual therapy), 97032 (electrical stimulation), 97530 (therapeutic activities), 20796 (injection), 64480 (injection), and 64472 (injection). There were 1,042 claims and 12,494 allowed services that fit this criteria, thus constituting the sampling frame, for a total paid amount of $326,017.75. (Tr. at 653.)

Eastern Benefit then selected the sample, using a formula from the textbook Sampling Techniques by William G. Cochran (3d ed. 1977). (Tr. at 657). This resulted in a sample size of 95 claims. Eastern used stratified sampling, which classified the sampling units in the frame into non-overlapping strata. See MPIM, Ch. 3.10.4.1.3 ("Stratified sampling involves classifying the sampling units in the frame into non-overlapping groups, or strata. . . . The main object of stratification is to define the strata in a way that will reduce the margin of error in the estimate below that which would be attained by other sampling methods, as well as to obtain an unbiased estimate or an estimate with an acceptable bias."). There were five strata defined by Eastern Benefit, according to the total amount paid to Dr. Anghel. A random sample was chosen from each group with the utilization of the RATSTATS program provided by the Office of Inspector

19

General.  The random sample contained 95 claims for 853 services, totaling $22,570.38 that had been paid to Dr. Anghel.

Eastern Benefit then reviewed the 95 claims in the sample, including the supporting documentation provided such as medical records.  It then evaluated the appropriateness of the claims and the services submitted for payment.  Eastern Benefit determined an overpayment amount for each claim in the sample, and totaled those overpayments.  The total designed overpayment for those 95 claims was $20,192.16.  In other words, there was an error rate of 89.5%.

Finally, Eastern Benefit extrapolated from this calculation in order to figure out the designated overpayment for the entire universe of claims.  Eastern Benefit calculated the average overpayment per claim for each stratum by dividing the designated overpayment in each strata by the number of sampled claims in each strata.  The average per stratum was then multiplied by the total number of claims in each corresponding stratum.  The designated overpayment for the universe, adding the sums across all strata, totaled $298,069.94.  However, once the lower limit of a 90% one-sided confidence interval was used, the amount of overpayment demanded was reduced to only $288,504.69.  (Tr. at 655, 659.)  An ancillary overpayment was also calculated.

As an initial matter, it is undisputed that the Secretary may utilize statistical extrapolation to determine the amount of overpayment.  Dr. Anghel does not take issue with the guidelines relied on by Eastern Benefit in arriving at its determination, subsequently affirmed by MAC.  Rather, she contends that the relevant guidelines mandate a different application of that authority.  Specifically, Dr. Anghel does not dispute that under CMS Ruling 86–1, sampling creates a presumption of validity as to the amount of an overpayment, upon which the burden shifts to the provider to attack the statistical validity of the sample.  Further, Dr. Anghel does not

20

explicitly contest the MAC's observation that the MPIM does not prescribe a particular sample size, precision, or sampling design, and requires the contractor to consider real-world economic constrains when choosing a sampling methodology.  Dr. Anghel nonetheless contends that the report of her expert establishes the invalidity of the sampling methodology used.

As such, the question is whether the MAC's finding that the sampling and corresponding extrapolation was valid is supported by substantial evidence in the record.  "Importantly, the sampling utilized need not be based on the most precise methodology, just a valid methodology." Miniet, 2012 WL 2930746, at *6.  "Moreover, there is a presumption of validity when statistical sampling is used by the CMS contractor and, as such, the burden is on Plaintiff to establish the invalidity of the methodology during the administrative review."  Id.

For purposes of evaluating potential Medicare overpayments, Section 3.10 of the MPIM contains the requirements that must be followed to ensure that a statistically valid sample is drawn, and that statistically valid methods are used to project an overpayment.  The MPIM requires that the Medicare contractor comply with the following conditions:

> The . . . contractor . . . shall maintain complete documentation of the sampling methodology that was followed.
>
> An explicit statement of how the universe is defined and elements included shall be made and maintained in writing.  Further, the form of the frame and specific details as to the period covered, definition of the sampling unit(s), identifiers for the sampling units (e.g. claim numbers, Carrier control numbers), and dates of service and source shall be specified and recorded in your record of how the sampling was done.  A record shall be kept of the random numbers actually used in the sample and how they were selected. Sufficient documentation shall be kept so the sampling frame can be re-created, should the methodology be challenged.

MPIM Chapter 8, §§ 8.4.4.4–8.4.4.4.1.  With regard to the sample size, the manual states the following:

21

'The size of the sample (i.e., the number of sampling units) will have a direct bearing on the precision of the estimated overpayment, but it is not the only factor that influences precision. The standard error of the estimator also depends on (1) the underlying variation in the target population, (2) the particular sampling method that is employed (such as simple random, stratified, or cluster sampling), and (3) the particular form of the estimator that is used (e.g., simple expansion of the sample total by dividing by the selection rate, or more complicated methods such as ratio estimation). It is neither possible nor desirable to specify a minimum sample size that applies to all situations. A determination of sample size may take into account many things, including the methods of sample selection, the estimator of overpayment, and prior knowledge (based on experience) of the variability of the possible overpayments that may be contained in the total population of sampling units.

In addition to the above considerations, real-world economic constraints shall be taken into account. As stated earlier, sampling is used when it is not administratively feasible to review every sampling unit in the target population. In determining the sample size to be used, the PSC . . . shall also consider their available resources. That does not mean, however, that the resulting estimate of overpayment is not valid, so long as proper procedures for the execution of probability sampling have been followed. A challenge to the validity of the sample that is sometimes made is that the particular sample size is too small to yield meaningful results. Such a challenge is without merit as it fails to take into account all of the other factors that are involved in the sample design.

MPIM Chapter 8, § 8.4.4.3.

Dr. Anghel raises a multitude of issues with regard to the validity of the statistical analysis, which the Court will address in turn. Each contention with regard to the SVRS and its corresponding extrapolation—subsequently affirmed by the ALJ and Secretary—will be reviewed, keeping in mind the standard of review set forth above.

### a.  Comparisons to Plaintiff's Peers

The first major contention which Dr. Anghel raises throughout her appeal is that at various levels of the administrative process, including the SVRS and extrapolation, Dr. Anghel's

claims were compared to the wrong specialty and this tainted the statistical analyses. The Plaintiff maintains that in 2004, her practice was split into two services—one for interventional pain management, and one for physical therapy. However, her "provider profile report" shows that for the first half of 2004, she was compared to peers in specialty 11—Internal Medicine, and for the second half of 2004, she was compared to peers in specialty 72—Pain Management. (Tr. at 460–65.) Dr. Anghel asserts that her profile report was inaccurate because her practice was "not comparable to those of internal medicine or other general practices." (Pl's. Memorandum at 16.) In this regard, a large number of the services under review were for her newly added practice of physical therapy, for which Dr. Anghel claims neither the internal medicine nor pain management specialty is comparable. As a result, Dr. Anghel insists that the services were disallowed based on the wrong standard.

However, the Secretary has explained a crucial point, which is ultimately determinative of this issue. The comparison of the Plaintiff's billing to that of her peers undoubtedly formed the basis of the finding of the aberrant billing pattern, which was one reason why the SVRS extrapolation methodology was pursued. However, these comparisons were not utilized in the actual overpayment determinations. Rather, the overpayment was determined by "reviewing the medical records of the beneficiaries for whom the sampled claims were submitted for payment to determine whether such records complied with Medicare rules, regulations and policies." (Def's. Memorandum at 22.); see 42 U.S.C. § 1395x(p) (defining "Outpatient physical therapy services"); 42 C.F.R. §§ 410.59–.60 (regulating what conditions must be met for Medicare Part B to pay for outpatient occupational therapy services). According to the relevant regulatory framework, at no time was the random sample compared to claims of other physicians.

23

The Court agrees with the Secretary's explanation.  With regard to the actual overpayment determinations, the basis for those calculations was the medical records provided as against Medicare rules and policy.  Thus, any claim of a legal error or lack of substantial evidence in this vein is without merit.

### b.  Validity of the Sample

Next, Dr. Anghel asserts that because the supposedly random sample of services contained only ten interventional pain management services for the entire year, the universe in the SVRS was not actually representative of her practice, thereby destroying any confidence in the validity of the analysis. (Pl's Memorandum at 18.)  Dr. Anghel contends that "the disproportion of what services were and were not included in the supposedly random sample demonstrate that the methodology of selecting that sample was severely flawed."  Id.

However, the Plaintiff does not point to any particular issue with the statistical method in which the contractor pulled the SVRS.  Moreover, she does not complain of the universe from which the sample was taken.  Rather, she exhibits dismay at the resulting randomized sample from that universe, vaguely alleging that it is not representative if the sample only included ten interventional pain management services for the entire year.

The Court does not find any error with the universe of claims included in the SVRS.  It was defined not only by interventional pain management services but also by multiple procedure codes, including pain management and physical therapy codes.  (Tr. at 652.)  Thus, the sample that was drawn, and the corresponding overpayment determination, stems from all procedure codes for the applicable time period, and not just the universe of interventional pain management services.  In reviewing the record, the Court sees no reason to doubt that the sample was not

randomized when taken from a universe that included items other than interventional pain management.

Dr. Anghel also appears to argue that the sample was not representative of the universe because the combination of physical therapy with pain management procedures was not consistent with the relative proportion of such procedures in the universe. Thus, instead of asserting that the universe was improper because it included both types of services, Dr. Anghel's argument hinges on the disproportionate number of pain-management procedures included in the statistical sample. Id. However, the Plaintiff does not present any data or evidence that would lead to the conclusion that the proportion of the services in the sample is not representative of the proportion that exists in the defined universe. See Pruchniewski v. Leavitt, No. 04 Civ. 2200, 2006 WL 2331071, at *11 (M.D. Fla. Aug. 10, 2006) ("Dr. Intrilligator's simple test for the representativeness of this sample is also interesting, but Plaintiff does not demonstrate that it dictates a conclusion that the sample was unrepresentative. As before the ALJ, Plaintiff offers no legal or statistical authority to the court on what is 'representative.'").

Instead, the record demonstrates that stratification was used to create five strata of claims with increasing dollar amounts. (Tr. at 652–59.) Certain claims were then taken—at random—from each of the five strata to create the probability sample. The random nature of the claims that were chosen was done using an established software program entitled RATSTATS. This methodology demonstrates that the sample was drawn as representative of the universe of claims. Thus, there was substantial evidence to support the ALJ's and MAC's findings, and the Court can discern no legal error in the statistical analysis based upon the supposed disproportions in the SVRS.

In addition, Dr. Anghel takes issue with the fact that certain pain-management services were included in the statistical analysis—namely procedure codes 27096, 64470, and 64472—yet the stated methodology would not have included them.  (Tr. at 1389–1390.)  Consequently, she asserts that the pain-management services had been cherry-picked for inclusion so that the sample was neither statistically valid nor random.  However, the procedure codes were identified from NGS's and Eastern Benefit's analysis to define the parameters of the universe.  Distinctly, the actual services that were reviewed were a result of the random sampling described above.  Thus, this claim is also without merit.

### c.   Internal Inconsistencies

As an additional ground for the alleged invalidity of the statistical analysis, Dr. Anghel contends that there are internal inconsistences.  In particular, she argues that the December 21, 2007 report states the extrapolation was based on 466 services provided in the 95 claims contained, while the January 8, 2008 letter of overpayment states it was instead 853 services provided.  (Pl's. Memorandum at 18.)  However, in the Defendant's response and cross-motion, the Defendant was careful to include a table which made it readily apparent that the number of *services lines* was 446 (which included ancillary codes), and the *total number of services* was 853.  In other words, there may be multiple units of service associated with one service line.  Thus, the distinction here, as apparent to the Court, was between the number of services performed and the billable time units for each service performed.  Id.  Accordingly, the Plaintiff's claims in this regard are denied.

### d.   Addition of Original Probe Sample to SVRS

Next, Dr. Anghel asserts that the SVRS final calculation was flawed because the Probe Sample was included in the final total amount overpaid.  Here, the Defendant is also in

26

agreement that the Probe Sample should not have been added back into the total billing for the year, and should be deducted from the final overpayment determination.  As a result, this Court concurs with both parties, and the Probe Sample's overpayment of $5,805.96 should be deducted from the final overpayment determination.

### e.  Documented Methodology

Finally, Dr. Anghel asserts that the ALJ's decision constituted clear error and an abuse of discretion because the ALJ should have considered that there was no documentation in the record of actual methodology that was followed, pursuant to MPIM § 3.10.4.4.1 ("An explicit statement of how the universe is defined and elements included shall be made and maintained in writing. Further, the form of the frame and specific details as to the period covered, definition of the sampling unit(s), identifiers for the sampling units (e.g., claim numbers, Carrier control numbers, etc.), and dates of service and source shall be specified and recorded in your record of how the sampling was done.").  However, as the ALJ and the MAC found, the statistical sampling and extrapolation methodology were well documented throughout the administrative record.  It includes information about how the universe of claims was defined; how the sample size was determined; how the sample was selected; and how the designed overpayment was determined.

In any event, to the extent that this claim is based upon the CMS guidelines, namely the MPIM, noncompliance with these provisions would not necessarily be a ground for overturning the Secretary's decision.  This is because the manual provisions are not binding law.  Failure of a contractor to follow one or more of the requirements contained in the manual would not automatically affect the validity of the statistical sample or any determination of overpayment. See Transyd Entrs., L.L.C. v. Sebelius, No. 09 Misc. 292, 2012 WL 1067561, at *6 (S.D. Tex. March 27, 2012) ("Further, the MPIM states that '[f]ailure by [contractors] to follow one or

27

more MPIM requirements may result in review by CMS of their performance, but should not be construed as necessarily affecting the validity of the statistical sampling and/or the projection of the overpayment . . .Thus, TriCenturion's alleged failure to comply with § 3.10.1.5, or to document its compliance, would not necessarily invalidate its sampling methodology.").

Therefore, this ground for the Plaintiff's appeal is also denied.

### 3. As to Whether the ALJ's Exclusion of the Plaintiff's Expert Report was a Violation of Due Process

Aside from her contentions regarding the initial determination of aberrant billing and subsequent statistical analyses, Dr. Anghel contends that her right of due process was violated when the ALJ made a retroactive ruling, after the close of the hearing, and without any notice or opportunity to be heard, to exclude the evidence presented by Dr. Anghel.  According to the Plaintiff, this evidence and Dr. Anghel's arguments had been presented in reliance on the original ruling made during the hearing, which admitted the evidence.  Thus, arguably because no opportunity was given to re-present evidence in light of this *sua sponte* reversal after the fact or to present arguments as to why the evidence should not have been excluded, the ALJ issued a decision unfavorable to Dr. Anghel.

As set forth above, a video teleconference hearing was conducted before the ALJ on July 21, 2009.  Prior to the hearing, on July 17, 2009, a report was prepared by Dr. Anghel's expert—Medicare billing consultant Jacqueline Thelian.  This initial report concluded that CMS's determinations regarding overpayment were approximately only half accurate.  In particular, she disagreed with Medicare on 61 dates of service, or 52%.  (Tr. at 504.)  However, on the morning of the hearing, on July 21, 2009, the Plaintiff's counsel faxed to the ALJ a revised spreadsheet from Ms. Thelian, known as "Exhibit 56".  This newer version was arguably necessary because Ms. Thelian had been able to review a more comprehensive set of documentation by that time.

28

(See Tr. at 1368 ("As we were preparing, we realized that [Ms. Thelian] did not have the full

charts to do her analysis, so she revised the charts based on analysis of the full medical charts.").)

The latter spreadsheet demonstrated that Ms. Thelian agreed with CMS on only 4 dates of

service, or 4% of the time.  (Tr. at 1367–68.)

      At the start of the hearing, the ALJ was required to make an immediate determination as

to whether to accept the revised report prepared by the Plaintiff's expert the night prior, as

opposed to the initial report that had been submitted a few days before the hearing.  Upon the

representation that Exhibit 56 was based on an analysis of the full medical charts which were

already contained in the record, the ALJ found good cause to admit the document.  In particular,

the ALJ stated the following:

> JUDGE BARKALOW:   If that is, in fact, more additional
> evidence, I'm going to find good cause to admit that as Exhibit 56
> in this file and that's based on the *potential* probative value of the
> evidence that you have submitted.

(Tr. at 1366) (emphasis added).

      Thus, the ALJ's admission of Exhibit 56 was premised on the understanding that the

revised expert report was based on evidence already contained in the record.  This understanding

was made clear when early in the course of the proceeding, the ALJ questioned Dr. Anghel's

counsel with regard to Ms. Thelian's expert report, because he was not entirely clear as to her

method of referring to the various medical records for the beneficiaries that were exhibits to her

report.  (Tr. at 1375.)  To this, Dr. Anghel's counsel responded that Ms. Thelian had "made her

own exhibits to attach to the spreadsheet . . . [and that] the dates of service should allow any

reviewer to locate the particular record she is looking at from the official file."  (Id.)  Thus, the

ALJ's understanding was that the file "probably ha[d] the exact exhibits and medical records that

she analyzed."  (Tr. at 1376.)

However, post-hearing, when the ALJ assessed Dr. Anghel's arguments and investigated the expert report and supporting documentary evidence, he realized that some of the medical records Ms. Thelian relied upon in creating the revised report were not included in the official record. For instance, for Beneficiary G. Chadha, Ms. Thelian reviewed progress notes from March 5, 2004, March 8, 2004, and March 10, 2004. From these three notes, Ms. Thelian determined that the March 24, 2004 services provided by Dr. Anghel did meet the Medicare coverage criteria. Yet, these visit notes were not part of the official record and were not provided to the ALJ. Further, the ALJ noted in his decision that "[a]t no time before, during, or after the hearing in the Representative's submission of the fully exhibited report [Exhibit 56], did the Representative inform the Court that they were presenting new evidence." (Tr. at 417.) The ALJ explained in his decision that the Notice of Hearing made clear that Dr. Anghel only had ten days from receipt of the notice to submit additional evidence. Accordingly, the ALJ determined that "[a]s the Representative was fully informed to the rules and chose to ignore those rules, the undersigned strikes the revised expert reports and the accompanying records for failure to provide good cause as to why the records were not submitted below." (Tr. at 418.)

To demonstrate good cause for the submission of additional evidence, one must "adequately explain [the] failure to incorporate the proffered evidence into the administrative record." Lisa v. Sec'y of HHS, 940 F.2d 40, 45 (2d Cir. 1991). In other words, one must establish "good cause for failing to produce and present the evidence at that time." Id. Here, Dr. Anghel certainly had the opportunity to provide the evidence of additional medical records to the ALJ and present good cause for doing so, either before, during, or after the hearing. The Plaintiff's counsel was fully informed of the documentation that the record contained and thus was on notice that certain records provided to Ms. Thelian were missing from the record that was

before the ALJ.  Nevertheless, during the approximate 30 day period between the hearing and the issuance of the ALJ's decision, the Plaintiff's counsel did not disclose that the expert report was based on and contained reference to new and additional evidence.  In fact, at the hearing, the Plaintiff's counsel represented the exact opposite to the ALJ—that the exhibits referenced in Ms. Thelian's report were already part of the record.  Dr. Anghel now states that hearing counsel merely stated that the expert's exhibits were based on the full medical charts, as opposed to the complete medical charts already in the record.  However, in reviewing the transcript, the Court does not find that to be a reasonable inference from the communications between the ALJ and the Plaintiff's counsel.  Thus, the Plaintiff cannot now point to the ALJ's alleged procedural violations when any blame for missed opportunities to demonstrate good cause lie with the Plaintiff and her counsel.

Moreover, there is nothing that prevents the ALJ from changing an initial finding of good cause in his discretion, even if that finding is made post-hearing.  See Diaz v. Shalala, 59 F.3d 307, 316 (2d Cir. 1995) (finding that a social security claimant's due process rights were not violated although an expert report was submitted to the ALJ one day after the hearing, because she should have known that his report would be included in the Board's file). Cf. Townley v. Heckler, 748 F.2d 109, 114 ("Use of [a vocation] post-hearing report [as the primary evidence upon which benefits were denied] violates a claimant's due process rights.").  For instance, in NOR Community Mental Health Corp. v. Sec'y of Health and Human Res., No. 09 Civ. 1000, 2011 WL 91982 (D. Puerto Rico Jan. 3, 2011), the ALJ refused to admit a certain document as an exhibit, determining that no good cause had been shown for doing so, post-hearing.  See 42 C.F.R. § 498.56(e) ( "[i]f the ALJ determines that there was not good cause for submitting the evidence for the first time at the ALJ level, the ALJ must exclude the evidence from the

proceeding and may not consider it in reaching a decision.").  While the plaintiff in that case

argued that the ALJ abused its discretion by disregarding the additional evidence—end times

documented in the transcribed and translated medical notes— the court found that the ALJ acted

within his discretion.

      Dr. Anghel asserts that vital to the concept of due process, she was entitled to notice and

an opportunity to be heard when the ALJ was making an evidentiary ruling on a report which Dr.

Anghel had largely relied upon in presenting the central evidence of her case.  However, putting

aside the issue of whether the Plaintiff had a constitutionally protected right to retain the

Medicare funds, the Court does not find anything that would constitute a violation of due process

of law.  The Plaintiff has not presented the Court with any precedent that would require the ALJ

to hold a hearing with respect to the Plaintiff's potential claim of "good cause".  Both before,

during, and after the hearing and prior to the decision, the Plaintiff was afforded the opportunity

to be heard at a meaningful time and in a meaningful manner as to the new evidence relied upon

by the Plaintiff's expert.  Dr. Anghel was provided with a lengthy administrative process in

which she had ample opportunity to present her case, including an independent review by a QIC,

an evidentiary hearing before an ALJ, and an appeal to the MAC.  The Plaintiff had a full and

fair hearing before the ALJ.  The ALJ merely denied the admission of a later submitted expert

report that was in contradiction to an earlier report by that same expert and importantly, based

upon evidence not contained in the record.  In the Court's view, in this administrative

proceeding, the Plaintiff received all the process she was due.  See Transyd, 2012 WL 1067561,

at *10 (finding that the provider had not been deprived of "notice and opportunity for hearing

appropriate to the nature of the case", in part because at the time the MAC rendered its decision,

he had received adequate notice of the bases for the Secretary's initial assessment and had been

afforded a reasonable opportunity to be heard on its positions).

In sum, the Plaintiff's arguments concerning alleged due process violations are denied.

### 4. As to the Finding that Dr. Anghel Did Not Exercise Reasonable Care and Is With Fault

Finally, Dr. Anghel asserts that she is without fault and the overpayment calculations

were inappropriate because she exercised reasonable care.  (Pl's. Memonradum at 22.)  Dr.

Anghel emphasizes that she sought medical guidance in conducting her billing, and provided

services that were medically necessary.  Dr. Anghel further asserts that although she did not

provide perfect documentation, she did provide the services billed and her documentation of

patient improvement as "tolerated well" is not vague and medically accepted.

Section 1870 of the Social Security Act "prohibits recovery of a Medicare overpayment

from an individual who is without fault when it would either defeat the purposes of Title II and

XVIII of the [A]ct or would be against equity and good conscience."  See 42 U.S.C. § 1395gg(c).

Section 7102 of the Medicare Carrier Manual states that a provider of services is without fault

where she exercises reasonable care in the billing for, and acceptance of, payments made to her

by the Medicare Program.  As a provider, Dr. Anghel was required to know the applicable law

and regulations regarding the requisite documentation needed for entitlements and

reimbursements under the Medicare Program based on her "receipt of CMS notices, including

manual issuances, bulletins, or other written guides or directives from intermediaries, or Carriers,

or [Quality Improvement Organizations]."  See 42 C.F.R. § 411.406(e).

It is obvious to the Court that Dr. Anghel's addition of physical therapy services to her

practice is what instigated the present dispute, as she never had Medicare billing errors in the

prior fifteen years.  According to the Plaintiff, she was aware that different medical specialties

33

are billed to Medicare under different standards, and thus she knew that the new physical therapy services would have to be billed differently.  She alleges that she took care to make numerous inquiries of Medicare, and to consult with billing specialists, to ensure that her billings for physical therapy would be in full compliance with Medicare's requirements.  However, the Medicare statute, CMS regulations, and manual provisions belie this contention.  Dr. Anghel was on notice of these provisions because "[a]s a participant in the Medicare program, [she] had a duty to familiarize [her]self with the legal requirements for cost reimbursement."  Heckler v. Comm. Health Servs., 467 U.S. 51, 64 (1984).  The Court finds that the ALJ's determination of fault is supported by substantial evidence.

### III.  CONCLUSION

For the foregoing reasons, it is hereby:

**ORDERED**, that the Plaintiff's motion for judgment on the pleadings is DENIED, except that the Court agrees that the overpayment at issue must be reduced by the incorrectly added amount of the probe sample, or by $5,805.96, and it is further

**ORDERED**, that the Defendant's cross-motion for judgment on the pleadings dismissing the complaint is GRANTED; and it is further

**ORDERED**, that the Clerk of the Court is directed to mark this case as closed.

**SO ORDERED.**

Dated: Central Islip, New York
December 13, 2012


_____/s/ Arthur D. Spatt_____
ARTHUR D. SPATT
United States District Judge